I'll call the case of the United States of America v. Dante Jacobs. I am present in the courtroom at 6th and Market. My colleagues, Judge McKee and Judge Ambrose, are participating as most of the court has been doing for the past year by video, and counsel are doing likewise. I thank everyone for accommodating us in that regard and for Greg Kane's enormous help throughout this sitting. In calling this matter, Mr. Goldberger, you may proceed. Good morning. May it please the court. My name is Peter Goldberger, and it's my privilege this morning to represent the appellant, Dante Jacobs, who was the defendant below. I'd like to reserve two minutes for rebuttal. That is granted. And, Mr. Goldberger, let me just say at the outset that, of course, we know that this case must go back for resentencing. The government has conceded that, which leaves the three issues you have raised. And for my part, I am not especially interested in hearing argument on issues number two and three. That is the issue, the Batson issue and the issue regarding the instruction. But in part, that's because you have raised a considerable number of questions with respect to insufficiency. And I think the panel is going to want to inquire quite a bit into into that issue and necessarily into facts or evidence that has been presented and avenues perhaps that have been left open. And I expect we'll spend a considerable time on that. So if you would proceed, then. All right. I thought the court would actually want to discuss the Batson issue as well. And I'm prepared. Well, I believe that you can you can follow the line I'm throwing you, Mr. Goldberger, or you can decline it. But I got you. You'll find out from my colleagues what they want to ask. Of course. Plus, what was the first argument you briefed? It was sufficient. Yep. Was it right? And I. Well, we could discuss technique some other time, but I when there's a good sufficiency argument, I think it always belongs first because it's the greatest relief that would be granted. So it's logically first in any case. On with respect to the government's concession. Let me say that we do have a dispute about the scope of the remand. I don't know that they've fully conceded everything that I said about what ought to happen on remand with respect to the resentencing. The. With respect to the insufficiency, the essence. This is this concerns the but for causation aspect of the aggravated offense. So the question is, how did the how could the government prove and in this case, did they prove that the particular heroin, which I can see that they did show was sold six days earlier by my client to Mr. And then by Mr. Collins to the young woman who died Miss Allie was indeed the cause of her death. The the principal weakness in the government's case has to do with the inadequate investigation by the Pennsylvania State Police of the crime scene evidence before the DEA got involved. Yes, let's let's start there. How about setting the scene by describing the area where Miss Allie was found dead? Yes. Describing the evidence that was found there and collected. Yes. Well, she apparently administered the fatal dose of heroin sitting on her bed and then fell. When she went into shock and then died from the overdose and fell off the bed. And so the first problem and this is not a police error of any kind with the kind of crime scene investigation that is used in these cases to help determine causation is. That the 911 operator advised her boyfriend roommate to move the body twice, understandably in an effort to revive her so that precisely where she fell and how she fell, which might have been of great value to the police or the medical examiner in drawing conclusions. That evidence was effectively destroyed by the Good Samaritan effort to to revive her first to be able to be more to be more specific, the what could have been lost in that movement was her proximity to particular evidence. That's correct. And possibly even more possibly where her arm was extended to or or anything else. Yes, that's right. So that's the first thing. The second, then, is that the state police or the local police and the state lab shows to. Well, let me back up a step in the room. There were three different kinds of heroin. Two of which of the three were tested and one test of to the extent it was tested indicated no fentanyl. So, and the other one that wasn't tested what we've called the, the Viking or skull marked heroin wasn't tested at all but is in a purse. Also within reach, seemingly within reach of where the bag that was tested that came out of. I'm not clear. Does it come out of the purse or it was on the floor was on the trash can. It was from the purse. They did not test anything from the trash can didn't test anything from the floor, the floor being the most likely site, I would think of the exact packet that was used. Instead, they tested a similar bag from the purse, and it was a full was a purse or shoulder bag. I don't recall what kind of There are a lot of two things. Okay. It was a lot of pictures. It was a full bag that was tested no residue from the right into bags. Right. Nor from the syringe strangely. How many syringes were in proximity sufficient proximity to suggest that was the syringe. She used because probably there were a lot of syringes in there. Yeah, I think the other strangers were in the purses. I think there's only one on the floor. I think I would give them that inference that that was the right syringe. Right. And weren't there also paper packet wax paper packets that contain some residue that were but not tested. This isn't very well explained by the witnesses to those of us who are not experts are familiar with the way heroin is packaged and used, but my I gather that It's, it's a, there's a wax packet with a small amount in a class in a small plastic bag and then there are a number of small plastic bags in a larger plastic bag that's like a sandwich size bag. And then a number of those might be sold together at the same time in some other kind of packaging. So it's a Chinese dolls, you know, set of smaller, not the smallest of those is the wax paper packet. And that's the wax paper packet that has the brand name so to speak stamp on it. And that's the one that was that my client sold and which the government claims instruction that all to the court as to to the to the jury as to how they should determine whether or not the sampling that was done gave a sufficiently reliable result to conclude to some level of Whether or not that cause of death came from the bulldog bags. Right. And that's exactly the next point I was going to make. I appreciate that question that the next problem is the testing of one out of some 50 packets when the undisputed testimony of the government's expert is that the mixing is so inconsistent in the when the heroin is cut that you cannot extrapolate from one bag to the batch as a whole. So, the, the government's own evidence defeats the inference of extrapolation that their case depends on. So I thought I thought your argument was in the briefing was the lab tested only one of the nine seized butter bags, right, that's the residue in any of the Viking bags. That's correct. And I thought your argument then was that there's no evidence that Jacobs ever sold the Viking bags. Thus, Ali could have died from fentanyl in the Viking bag alone. Yeah, but I thought you said that she died from heroin. Is that correct. No, no, no, I'm sorry. That was a misstatement. The, the, the, the pathologists testimony was that the immediate cause of death is fentanyl, which is mixed with heroin. I mean, so the, the addicted person is would say she's going to buy heroin. I don't think they go to buy fentanyl fentanyl is a cut, but it's particularly it's fentanyl is used to cut, because it is less expensive to make and import and buy for the wholesalers, so they dilute the heroin but it's particularly deadly. It's a particularly deadly substance. It's not like cutting with caffeine. Right. It's the fentanyl that causes death. Mr. Goldberger, let, let me approach this in a, in a somewhat different focused way. And that is to examine your position in light of what is a fundamental practice of putting together a prosecution and first conducting an investigation. And that is that investigators and eventually prosecutors ought to be establishing a case eventually and preparing a case by excluding other possibilities, which of course will have enormous implications and may hear for whether the standard of proof beyond a reasonable doubt can be met. So, if you would please, will you look at the government's case with that focus, and that is examine what the investigators and the prosecution failed to exclude as a possible cause of death, and which therefore might have stood in the way of a beyond a reasonable doubt determination. Sure. Well, they failed to exclude the bulldog heroin by testing only one bag of it, finding that that little bag, that little packet didn't have any fentanyl in it and stopping there that's the extrapolation problem that I was just saying. And then packets. Sorry. How many bulldog packs was it a seven. I don't remember the number. Okay, okay. But certainly many, you know, and, and if you're going to measure contained only heroin and not fentanyl is that right. The one little packet that was tested. But because of the extrapolation problem, as explained by the DEA witness. I mean he didn't view it as an extrapolation problem but his testimony defeats the extrapolation assumption that the government's case depends on that is that when the heroin is cut, it's not uniformly mixed, so that you could literally have and he said this exactly this testimony, you could literally have a packet with no fentanyl in it and yet there was fentanyl in the batch. Now the government's argument, all the evidence that was presented all of this evidence was presented to the jury, and they waited. And they heard testimony about the Viking bags being empty found in a closed shoulder bag. They. The inference could be that you know she consumed the drugs and the Viking bags a while ago, and, and not immediately before her death. So, what, what's wrong with that argument. The way we framed it in the reply is that the disagreement here is between what's a reasonable inference and what speculation. Our petition is that that kind of argument by the government is depends on speculation not inference. You can't just guess that we can't put the jury in a position of just guessing. And then on review, call it an infer a reasonable inference by the jury there isn't evidence from which the jury could conclude that she to focus on the way Judd Smith asked it didn't use the other heroin. I say the most important and interesting point here is that we have an addicted person who kept a lot of supply of various kinds that she had clearly bought in different places at hand. This is, this is not be drawn. Wait, wait a minute. I thought that Jacob supplied to Collins Collins supplied to Ali, and then a reasonable juror could have concluded beyond reasonable doubt that Ali died of the fentanyl that Jacob soul. And if there was only one kind of heroin at hand in the apartment, that would do it for the government. But the key, what the main thing we discover is from the search of the room is that this is a person who did not use up her heroin and then go find more. This is someone who kept supply on hand like a pantry in your kitchen. And so the fact that that the heroin that she most recently bought appeared to be the heroin traceable back to my client does not mean it's the heroin she used that night. Did the jury even have to determine that she kept this entire inventory? Couldn't the jury have believed that she had access to or shared an inventory with someone else in the home? That doesn't hurt you. That's true. Although the roommate testified, I didn't think particularly credibly, but I wasn't there to watch him that he was himself not a drug user. But I'm not accustomed to hearing you argue to credit the testimony of a prosecution witness, Mr. Goldberger. That's but we'll move on. Well, no. So you mean the D.A. agent? I mean, it was no, I mean, no, absolutely not. I am referring, as I assumed, you know, you knew to Mr. Cain boyfriend. Yes, that's right. And I have to say, when I read that, I rolled my eyes, but that the jury could could have found that either way. But in any event, there was supply at hand, whether it was hers, whether she was the one who bought it, whether he you know, it was it was at hand. And certainly it would not have been reasonable for the jury to conclude that she wasn't aware of it. It was all right under and by her bed and in a purse. The problem that I'm having is there was a close match between the butter bag tested near Ali's body. And the later butter bag seized from Jacobs himself. Yes. Both those bags contain fentanyl. Sure. Sure. And that if it wasn't for the other supply that was untested or inadequately tested, that would. That would have been it we wouldn't have had this argument at all. But if the testimony we're not. It's no part of our argument. Sorry, but if the testimony was that everything that was used by Ali her sole source was Collins Collins sole source was Jacobs. That's the problem I'm having if you can you get me around that. We don't know that the jury could not have concluded that that was her sole source. It was her frequent source, but there were two other kinds of heroin in the room at hand. They had to come from somewhere. I'm looking at appendix 627 and 28. I thought the testimony of Jacob's was the exclusive supplier of drugs to Collins and Ali was buying five bundles of heroin from Collins every day. So far as Cain knew the night before death. So far as Mr. Cain knew. So he said. But it's inconsistent with the physical evidence. By pages 532 31 and 562 to 63 that she exclusively bought heroin from Collins. Competent witness could testify to that that's the hurdle I'm having. They didn't call her the other friend. As a witness, and no one who did testify would be competent to give that to give you confidence that that's so she she died. And we know that she free in the last year or so was frequently buying a couple of years I think frequently buying from Collins. Most days, but not every day, and that there were two other kinds of heroin in her room by the bed. All right, let me again focus in a different manner, which is in this case to ask you, Mr. Goldberger, to place yourself in the position of the prosecution. And tell the panel just how the government could have avoided the predicament that you're suggesting there in here. Now, what what more perhaps what little bit more could the government have done to remove the reasonable doubt that we necessarily would have to find here in our inquiry to justify setting aside the verdict? Well, I've never been a prosecutor. I'm not sure I can do that. Oh, I think you're a good lawyer. You're a good lawyer. You're making the argument. You can. I think you can. Unless you want to decline to answer on the basis that I'd incriminate you. I would say at least they they should have tested a sufficient number of packets from all three types of heroin and then presented evidence that this was a that there was a scientifically valid basis to extrapolate. From what was tested. The problem with that answer is what is sufficient, number one. And two, I'm concerned that Patrick was, I don't know if they attempted to interview him or not, but he never testified. Who was the other person? And that was going to be exactly my next point is and the other, the guy who was named but not called would test presumably would testify because he's the one who, according to the testimony, took Allie to meet dealers when Cain wasn't present. So, it appears as though the Viking was probably, who knows, but I can may well have come be a Patrick, and there's nothing to tie Patrick to quite possible, but I think the insight that Judge Becker had in the guidelines case in the early 90s about extrapolation is absolutely applicable here. Right. McCutcheon is that if you're going to test less than all of a batch, then you must that you, the government must present some basis for the fact finder to reliably infer the, the, an extrapolation to the untested portion. I think that would be lacking here. That would be a good place, I think, for Ms. Cloud to begin, but let me first ask if Judge McKee and Judge Ambrose have further questions with respect either to the insufficiency or sufficiency issue or the other two issues that have been raised here, realizing we'll have Mr. Goldberger back for rebuttal. Yeah, I can do it on rebuttal because I still don't know what sufficient number is, but we can explore that with Mr. Goldberger. I've got so many questions. The more I think about this, the more questions I have. I have all day. Yeah. I know. Judge Ambrose. I've asked my questions for now. So let me just conclude by saying that what this gets us is a remand for the entry of a verdict on the, not a new trial, but a verdict on the lesser included distribution count as established in the Roe case. Right. So, yeah, if we're going to be sending it back for resentencing in any event, but if we were to sustain your position with respect to insufficiency, then the B1C component is out. And there would be a, you know, a. That's the B1C aggregate is out. So there would be a regular B1C. Yeah, I call it a component quibble over quibble over the characterization. Yeah, it's from zero to 20 years available. It would still be a 20 year maximum. All right, Miss Cloud. Your Honor, Whitney Cloud for the United States. Thank you so much for the honor of allowing me to appear. The standard of review here, clean air review of the evidence necessitates affirming the jury's verdict. At least from my perspective, that is maybe the weakest argument you could possibly have. I cannot tell you how much time I put into looking at standard of review, whether a clean air review differs qualitatively from reviewing for sufficiency of the evidence. If there is a difference, I can't find it. The standard of reviews clearly helps you. It really helps you tremendously here, but I'm not sure it might get to the first base. It sure as hell doesn't get to the home plate as far as I'm concerned. So help me understand how, in a situation like this, the syringe is not analyzed, which boggles my mind, frankly. I just, as a prosecutor looking at this case, and I'm not faulting you. I'm assuming, given your status with the appellate unit, that you were not the trial attorney. But I couldn't imagine that an assistant juror's attorney just walked in to me, getting on the phone and saying to the lab, look at the syringe. Get me a quantitative analysis of what was in that syringe. Go back to the other butter bags. Get me, I don't know what the number would be, but sample more of those butter bags. Sample the Viking and sample the Bulldog, and then let's talk about getting ready for trial. And that wasn't done here. We have syringes not looked at. We don't know what bag was in closest proximity to her at the time of her death because the body, as the chief said, the body was moved twice. And to make it even worse, the bag that was analyzed wasn't where we would presume, even though the body was moved, the body, the heroin that she consumed last would be. It was from a purse. It wasn't from the floor or the top of the trash can. I mean, the problems abound, and it seems to me that what we're being asked to do is affirm based on rank speculation. The verdict is not illogical. It's not illogical, but it's I don't know how reasonable it is. But your honor, if I can start with the last point and then I will try and address all of the points your honor has just made. So starting on the last point of the verdict not being illogical, even under a harmless air review in United States versus Caraballo Rodriguez, this court said that it's not going to overturn a jury verdict. It's not going to reweigh the evidence if there are other possible inferences or other even plausible inferences. So long as the jury's conclusion is not irrational. So that does play a stand of an important part here. Now, if I can go through and your honor started with talking about not testing the syringe and alleged inadequacies. And your honor. First of all, the defendant stipulated to the testing in this case, he stipulated to the methods. Yeah, the method of the test that was done, but he clearly did not. Why would I read the stipulation? The stipulation is not so broad as to concede that there is a scientifically valid conclusion that can be drawn from the whole by testing the one bag from the. But some of that additional basis can be inferred, and I believe was inferred by the jury, given the pattern here so we have three, three principal facts that make the butter stamped heroin, the most likely and beyond reasonable doubt the most likely heroin that killed Teresa or fentanyl that killed Teresa alley. That is one, the chain of distribution. I believe Judge Ambrose mentioned this. The chain of distribution was very clear from from Dante Jacobs to Jonathan Collins to Teresa alley, that's where she got her heroin consistently day after day. That's where she got her butter heroin. Well, and that that's your honor my second point, the butter stamp. She bought Jonathan Collins testified she bought this heroin, the night before her death. She had a habit of buying five bundles of heroin, a day, one bundle and she would use one bundle at a time, one bundle was used that bundle that was used was the butter stamped heroin from him. So she bought that on the which butter stamp did she buy she buy all of it from him the butter on the floor, but on the trash can the butter in the purse, because that would give an amount much greater. That would be established by energy any testimony that she would buy from him in a single visit. Your Honor, I believe the testimony was that she bought five bundles of heroin a day. There were four bundles that were unused of the butter stamped heroin in the purse nearby one bundle had been used and the little baggies within the bundle. I believe Mr Goldberger referenced it as a, you know, a nesting doll paper thing right so the the wax paper baggies that have been used somewhere on the floor. Many were on the trash can right next to her body. So that is a, that is a strong inference for the jury to take. And then further the butter stamped you know what was it there's no we do we know a fentanyl was in that we know that fentanyl was in at least the one baggie that was tested from from that scene, as well as your honor from the purse. No, if there was any fentanyl in the trash in the drugs that you're describing here from the top of the trash can the bags on the floor or the syringe, or we can assume it from the syringe there was probably fentanyl in there. Your Honor in terms of the feasibility of testing baggies in which the heroin has already been extracted and use. I'm not sure there was robust testimony on the feasibility of that because again it wasn't challenged. So, I can't I don't think I can point you to the record to any examination from either side saying you didn't necessarily have to establish an element because there wasn't a challenge to the use of that element. I think I think what I, what I would characterize what I'm saying is that there are multiple ways of proving something. Obviously, I think in our, in our modern society and with scientific methods, testing is incredibly helpful. You just said something which is very significant scientific method. Was there any testimony to the jury, or any instruction to the jury about what quantity of sampling would be sufficient to allow them to conclude with some degree of certainty and I won't put mathematical certainty, some degree of certainty that the fentanyl that was seized from the was extrapolated from the one bag was tested established sufficient probability that that came from her when she purchased from Collins was there any testimony of that sort. Your Honor, if you're whether there was any. I think I might have misunderstood the question. That's not your fault I didn't ask you very well. My concern I'm sure. Thank you. And then maybe you can extrapolate a question from my concern, because I really do not do a good job of asking it. My concern is you've got a lay jury here, and you're asking them to conclude based upon one sample that was drawn from a scene that contained other heroin that can't be tied to Collins. We don't know how many of the bags that came from Collins had fentanyl. Maybe all of them did, maybe 50% did maybe 25% did. Maybe all the biking bags had fentanyl maybe all the Bulldog bags that fentanyl, since we get into a point where the you're asking the jury to include something which really does turn on rank speculation where I said it was logical, it's logical only because the speculation arises from some testimony in the record. But whether or not that testimony in the record is sufficient to support an inference, that just seems to me that you're asking us to sustain a verdict based upon maybe the sloppiest investigation I've seen in terms of drug work. And I for 10 years, maybe five of those I presented over trials, three of them were homicide trials, and I signed a daily base, maybe not the best police work in terms of how you prove a drug case. Wasn't it the Colombo standard that's for darn sure. This would even be shabby compared to that, which is saying something. Judge McKee has Judge McKee has just captured what I was trying to get at with my question about excluding other possibilities. And I was a prosecutor and I was a trial judge. And so I'm trying to understand why not necessarily the prosecution, but the investigators and, of course, the lab or labs were not attempting to exclude as well by conducting tests on the other substances found at the scene. Your Honor, I without placing myself exactly back in that spot, I think the evidence. This may not be satisfying, but the evidence of this in front this chain of inferences of Dante Jacobs distributing the heroin to Jonathan Collins, who distributes it to Teresa alley that that habit that she had the fact that the butter stamped heroin was was purchased the night before was used. Was so strong that the strong. How strong was it because there was no quantitative analysis done. We don't know how strong it was. The fentanyl was sufficiently strong enough to be fatal. We don't how much the fentanyl she took. Let me just add to that, that recorded calls between Collins and Jacobs reveal that Jacobs thought that the butter bags did not contain fentanyl. And so, if she died of fentanyl. It might be if Jacobs was right. What overcomes that at trial. Your Honor, I think those recorded calls if I could start with that point that I think the recorded calls actually show a dialogue in which Jacobs is acknowledging that the drugs that he's distributing are dangerous because I think all drugs are daily on it every day. If she died of fentanyl. And he Jacobs tells Collins that he didn't think that his butter bags contained fentanyl. Then wouldn't that indicate something other than the butter bags may have killed. Miss Ali in her. Overdose. Again, because Jacobs didn't himself fill fill the butter bags. And I don't think anybody disputes that Jacobs can't know for certain what is in those butter bags it's a risk that he's taking in distributing these drugs he knows that some of the drugs he distributes do contain fentanyl he acknowledges that people die from overdoses off of these types of drugs every day. Some of the drugs he distributes contain fentanyl. I can just find the page. You might want to take a look at appendix 116. And if not, you can do a 28 day letter in. Okay, thank you, Your Honor. I think a fair a fair reading of that or a fair interpretation of that discussion between Mr Jacobs and Mr Collins is that they're debating. They're talking about the potency of various drugs. Mr Jacobs might have expressed some surprise about the about the butter, but they're acknowledging that the butter was good that the butter butter had people wanting wanting more and also that that the presence of fentanyl can can cause people to come back for the drugs time after time. The cocaine can do that. The presence of cough syrup can do that. The presence of that's the nature of addiction, any drug that's addictive alcohol can do that wine can do that, that that doesn't help you. And maybe you just spoken earfully there but that's certainly the fact that this is a drug that cause people to come back from time, time after time, I don't know where that gets you. Your Honor. So, if I if I may return to something your honors have been touching on in terms of where the the testing itself. Your Honor, certainly more testing can can be done. And that is a critique I will certainly take back, but when we're talking about a stipulation that does not challenge the testing, a, a plain air review that doesn't put before the jury. The, the same arguments that appellate counsel is bringing up before the court. Once again, the standard becomes really really important in terms of the other possibilities that your honors are pointing out from other drugs that might have killed Teresa Alley, which I would argue are not even the most likely drugs to have killed Teresa Alley. They have to fall to the wayside for the jury verdict who were properly presented evidence, they could draw the inferences they wanted to, and they drew this inference. You're back to your back to your first argument. I mean, yes, you know, and you're saying, you know, was there an error was it playing you're saying somehow. It wasn't playing, but if there was an error and it was playing would have affected what happened. But you're going to have to get into the weeds here with us in order to show that the fairly low bar of sufficiency of the evidence was met. And what would you what would you say in 25 words or less would be the reason that that threshold was met. Your Honor, the threshold was met, because the butter stamped heroin at the scene contained fentanyl. The butter stamped heroin acquired several days later contained fentanyl. Fentanyl killed Teresa Alley. Teresa Alley acquired her drugs from Jonathan Collins who acquired his drugs from Dante Jacobs. That makes Dante Jacobs, a but for cause of Teresa Alley's death. Yeah, which which leaves us with as as was suggested by Judge McKee, a logical chain and therefore a chain that certainly would have no difficulty passing the low hurdle of preponderance of the evidence. But we remain stuck on as we must be the question of whether or not it meets the beyond a reasonable doubt standard. That's what we're left with. Your Honor, I think and if and if and if evidence found at the scene sufficiently proximate to the body of Ms. was found by the investigators, inventoried by the investigators, but some of it not tested. That also logically leaves open the possibility that those packages, those drugs contained fentanyl as well. Why does that not raise a reasonable doubt? Because, Your Honor, we're talking about possibilities, not probabilities. And the. Why are we talking about probabilities? Given let's talk probabilities. And believe me, when it comes to math, my inability to grasp math, I'm convinced killed Mrs. Casey, who was my eighth grade. That's why we're all we're all lawyers. Yes. Died at the age of 80. But I know it's because of me. You got all these bags. Is that what I have to look forward to? Thank you. Thank you for the warning. Yes. That's it, Brooks. That's it. That's what's ahead of you. All of these bags, you'd sample one. You don't even sample it quantitatively. So we speaking now about probabilities, there's no way of knowing whether or not the bag that was sampled had enough fentanyl in it to be a lethal dose given her body weight and everything else. So you don't that doesn't get you very far, given the fact that one bag out of 52 butter bags have been sampled. None of the biking bags have been sampled. None of the bulldog bags, I think, was sampled in the bag that was sampled was not in closest proximity to her. It was in her purse, not student about the four were one might assume that she would be consuming it. Given what you said about scientific, I brought it up. You said, I don't know. I don't even know if that gets you there. Your Honor. The, the ability to test for concentrations of the drugs is a is a more recent phenomenon but we've held we've held defendants accountable for years for distributing drugs that result in death on on the basis of evidence that looks like this with regards to me. Show me a case where you have this especially focusing on McCutcheon what we said in McCutcheon. And that wasn't even a reasonable doubt case that was a case where the issue is whether or not there was a sufficient reliability of the weight of the substance to justify going beyond five grams I think it was of her one and, and we said, look, the judges got to make a determination that the method of sampling is sufficiently reliable to justify the increased sentence. That was not reasonable. So in McCutcheon. Go ahead. Your Honor in McCutcheon, I believe the sampling was itself challenged at sentencing, and that's where the court then announced that when when when something is challenged the judge does have to make certain findings but here, it wasn't challenged. They don't, they don't, you don't have to prove the elements of defense unless they challenge it is that what you're saying, unless they stand up and say specifically that this is not sufficient to tie the drugs to my client and granted they should have done that and we know Mr. Goldberger didn't try the case that he tried it we wouldn't have this problem. But that doesn't mean what you're saying that I'm looking at the record now you we've gone from saying that you got to rely upon plane air review and sufficient evidence, and now you're saying well they didn't really challenge it before, and you're not suggesting the way for the argument, are you. Maybe you are the weight, weight of the argument. I mean, Your Honor. This this argument about testing was not was never put before the district court there was no opportunity to have an instruction to, to really put this argument before the jury about whether the testing was told they got to find beyond the reason about, and it seems to me, a judge and telling a jury beyond the reasonable doubt. I couldn't imagine a charging a jury in a case like this where you don't give the jury some information to determine whether or not they think that the sampling that's been done is sufficient to allow them to convict somebody beyond a reasonable doubt, or wasn't done here. And I don't want to be too critical of you, Mr. No, Your Honor, this is all this is all completely fair game. Again, I think we just take a different view because we believe here the sampling. The, the fact that the butter stamped heroin came back as positive for fentanyl both times was, you know, to put it crassly icing on the cake in terms of the evidence, demonstrating that this butter stamped heroin distributed by Dante Jacobs killed Teresa out. Judge McKee, Judge McKee, Judge Ambrose, do you have further questions of Miss cloud and certainly we can continue if you do know, I don't want to be a dead horse I would just suggest to this cloud, clearly you sense our concern. And if you could just take back to your office. This is really whether or not is legally sufficient, at least to my mind it seems clearly unacceptable, and it does not excuse for it and it can easily be avoided. These were state officers they weren't federal officers, but the trial attorneys in your office can avoid this kind of thing by just making sure when you go to trial, you got a better job. It's done by this this is just your honor I will thank you. Thank you. Thank you. Miss cloud very much Mr Goldberger you have rebuttal. Thank you, Your Honor. And before I turn directly to the sufficiency rebuttal I just would like to encourage the court to look at the record on the Batson issue because I do think it raises quite profoundly. We have all read and I can speak, at least for myself I've read the entire Batson transfer the entire jury selection, not with respect to only to the two jurors raised but from, from top to bottom from beginning to end, very careful review. Part of the problem there is the very nature of primaries I mean the guy that died here. You know, arguably, I read that this guy probably died and said the night before, to get out of jury service, but that's not what we want to go with you right now. All right. Okay. Let me just say then very briefly I won't use my whole two minutes at all that the. It is this. Let me start with the stipulation as, as the focus of what Miss cloud is saying that the defense stipulated that the methods were valid. The method is is gas chromatography, and, and there's nothing wrong with that. But it is not on the defense lawyer, or on the defense side in general in a criminal case to point out the weaknesses in the government's case, and help them to prove to fill the holes before they rest their case. It's quite the opposite. And so this is not about jury instructions. These are about logical holes in the government's case that resulted from and I think we've heard this implicitly resulted from jumping to a conclusion of guilt too fast. This is the kind of thinking that results in wrongful convictions and I'm not saying this is a wrongful conviction case, but it's the same fallacy is not looking open mindedly at all the evidence and building a case that excludes reasonable doubt here. The. There were too many other distinct possibilities that were not available just to resolve with inferences. Yes, there's a chain of distribution that's not the problem. But the question is whether that drug that was down the chain is the drug that killed Miss Allie and that they did not prove beyond a reasonable doubt. So we leave it to you to and suggest that a reversal as we've discussed for the last 40 minutes is called for here. Thank you very much, Mr. Goldberger, and thank you very much, Miss Cloud. As you can both see, this is a case that raises serious questions in the minds of all three members of the panel. We're all concerned about the investigative aspect of this, not to mention the complete nature or lack thereof of the lab work. We'll take all of that into consideration in taking the case under advisement. Thank you very much. This matter is concluded.